**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

UNITED STATES OF AMERICA

v.

JOSE ANTONIO MARTINEZ (1),
EDUARDO FERNANDEZ (2),
JULIO GONZALEZ-TERCERRO (3),
JOSE COTO-LOPEZ (4),

             Defendants.

CRIMINAL CASE NO.

1:13-CR-00180-ODE-JFK

## <u>REPORT AND RECOMMENDATION</u>

       Pending before the court is Defendant Julio Gonzalez-Tercerro's motion [Doc. 61] to suppress his statement and motion [Doc. 62] to sever the trial of his case from the trial of his co-Defendants.  An evidentiary hearing was held on the motion to suppress on October 15, 2013.  [Doc. 78].[1]  In his post-hearing brief, Defendant contends that his non-custodial statement on May 16, 2013, was not voluntary due to the fact that he was questioned in English when Spanish is his native language.  [Doc. 79].  The Government opposes the motion to suppress contending that the totality of

_____

[1]Citations to the evidentiary hearing transcript are:  (Tr. at ).

the circumstances establishes that Defendant's statement was voluntary.  [Doc. 83].

And pursuant to Fed. R. Crim. P. 14, Defendant seeks a severance for trial due to

allegedly prejudicial introduction of evidence at a joint trial.  [Doc. 62].   The

Government opposes the motion for severance arguing that Defendant has not

established compelling prejudice or that curative instructions are inadequate to address

any prejudice.  [Doc. 82].  After consideration of the arguments of the parties, the court

recommends that Defendant's motions be denied.

## Motion to Suppress Statements

As noted, in his post-hearing brief, Defendant contends that his May 16, 2013,

statement to federal agents should be suppressed as involuntary due to the fact that

<u>Miranda</u> warnings, which were not required but nonetheless were given, and the

subsequent interview were in English.  [Doc. 79].[2]  Citing no legal authority in support

of his argument that a defendant's lack of full understanding of the language used

during an interview renders the statements made involuntary, Defendant states that "the

court should adopt a rule that where police advise a suspect of his <u>Miranda</u> rights,

─────────────────

[2]In the motion to suppress statements, Defendant had also contended that his
statement was custodial requiring <u>Miranda</u> warnings and a valid waiver of his rights.
[Doc. 61].  At the evidentiary hearing, Defendant withdrew this challenge to his
statement.  (Tr. at 37).

2

absent exigent circumstances[,] that those rights should be explained or read to that individual in a language which the suspect understands without the need for additional explanation or clarification." [Doc. 79 at 4]. The court declines to adopt such a rule and, in fact, finds that no legal authority supports imposition of such restrictions on law enforcement authorities. Furthermore, under the totality of the circumstances in this case, the court finds that Defendant's statement was voluntary.

## I.      Background Facts

In May 2009, Agent Roy Rutherford, Homeland Security Investigations (commonly known as "ICE"), began investigating the diversion by Delta Airlines ramp crews of luggage containing controlled substances arriving on international flights at the Atlanta Hartsfield-Jackson International Airport. (Tr. at 3-4, 6). These Delta employees, who met arriving planes and unloaded checked baggage, would remove identified luggage from the plane on the tarmac, divert the luggage from entering the terminal and take the luggage off the airport property. (Tr. at 7-8). The first seizure by law enforcement authorities of such a piece of luggage occurred on May 8, 2009, when a bag containing twelve kilograms of cocaine was located on a flight from the Dominican Republic. (Tr. at 6). On February 19, 2011, a bag containing twenty-two kilograms of cocaine was seized on a flight from Mexico City. And, on January 13,

2012, federal officers seized a bag on a flight from Mexico City that contained fourteen kilograms of methamphetamine. (Tr. at 6-7). The agents identified participants in the scheme and began charging and interviewing those individuals who subsequently identified Defendant Gonzalez-Tercerro as a Delta ramp crew member involved in the smuggling operation. (Tr. at 7-9, 30-31).

Agent Rutherford investigated Defendant's background, including with Delta Airlines, and determined that he arrived in the United States in 1990 at age twenty and became a naturalized citizen. (Tr. at 9). Defendant was hired as a ramp agent by Delta in 1999, initially working at the Boston Logan Airport in Massachusetts before transferring to the Atlanta airport in 2005. (Tr. at 8). A review of his Delta personnel file, which was in English, establishes that Delta requires all potential employees to be able to read the employment application and contract, which are in English, as well as to complete an interview, conducted in English, to ensure that the potential employee can communicate effectively in English. (Tr. at 8-9, 15, 28; Gov't Ex. 6). This is a requirement based on the need for ramp safety when on the job. (Tr. at 9). Defendant's employment application also indicated that he had attended school in Guatemala, taking pre-engineering courses in high school and engineering classes in college. (Tr. at 15).

4

At Agent Rutherford's and ICE Agent Christopher Wright's request, Defendant's supervisor brought Defendant over to them on the ramp area at the airport.  The agents introduced themselves and asked Defendant if he would talk with them, and he agreed. (Tr. at 10-11).  The agents asked if Defendant would accompany them to their office located in concourse F, the international concourse, and Defendant agreed.  (Tr. at 11-12).  The agents communicated with Defendant throughout their discussions in English, and Defendant appeared to understand.  (Tr. at 11).  The agents did not restrain or place their hands on Defendant while walking to the office.  (Tr. at 12).  They all seated themselves at the table in a conference room, with the door to the room remaining open. (Tr. at 12-13, Gov't Ex. 1).  ICE Agent Jason Saude joined them.  (Tr. at 12).  The agents were in casual dress with their firearms secured underneath their shirts.  (Tr. at 14-15, 23).

During the interview, the agents did not threaten Defendant and did not make him any promises.  (Tr. at 14, 17, 23).  The tone of the conversation was friendly and non-confrontational.  (Tr. at 14, 23).  Defendant was never restrained.  (Tr. at 23).  And he was told that he was free to leave at any time and that he was not under arrest.  (Tr. at 14).  Defendant, who was friendly and willing to answer questions, never asked to stop the interview and never asked to leave.  (Tr. at 14-15, 23).  Defendant did not

5

appear to be suffering from any mental or physical disability, and the agents believed that they were able to communicate with Defendant effectively.[3]  (Tr. at 16, 19, 22-23).  The agent advised Defendant that if he did not understand, Defendant should tell the agent and the agent would clarify his statement or question.  (Tr. at 20, 35-36).  Defendant advised that he understood 80% of what was being said.  (Tr. at 20, 35).

And, although Defendant was not under arrest, at the beginning of the interview, which was recorded, Agent Rutherford advised Defendant of his Miranda rights, also in English.  (Tr. at 18-21; Gov't Exs. 3, 5).[4]  The agent read the Miranda rights to Defendant, and when Defendant hesitated or asked for a clarification, the agent provided an explanation, after which, Defendant indicated that he understood his rights.[5]  (Tr. at 24-28, 36).  Defendant then signed the waiver of rights form.  (Tr. at 22;

---

[3]Because Agent Rutherford believed based on his knowledge of Defendant's background and on his interaction with Defendant that Defendant could effectively communicate and understood what was going on, the agent did not seek the assistance of available Spanish speaking agents or officers and did not utilize a Miranda form written in Spanish.  (Tr. at 20-21, 32-33).

[4]The transcript of the interview recording was introduced into evidence, and the Government played the advice of rights portion of the interview at the evidentiary hearing.  (Tr. at 19, 24-28; Gov't Ex. 4).

[5]For example, the agent advised Defendant "you have the right to remain silent. Do you understand that?"  Defendant responded, "if I don't want to answer a question." The agent stated, "Exactly, you don't have to answer a question if you don't want to."

Gov't Ex. 5).  During the questioning that followed, Agent Rutherford testified that Defendant appeared to understand what was being said to him and that the agents understood Defendant's responses.  (Tr. at 22-23).  The interview lasted approximately one hour and thirty minutes.  (Tr. at 22).  At the completion of the interview, Defendant returned to work.  (Tr. at 29).

Additional facts will be set forth as necessary during discussion of Defendant's motion to suppress.

## II.   Discussion

The Supreme Court has recognized "that noncustodial interrogation might possibly in some situations, by virtue of some special circumstances, be characterized as one where 'the behavior of . . . law enforcement officials was such as to overbear petitioner's will to resist and bring about confessions not freely self-determined. . . .'" Beckwith v. United States, 96 S. Ct. 1612, 1617 (1976) (citation omitted).  Defendant contends that such "special circumstances" exist in the present case and that he was

---

The Defendant stated, "Oh, okay."  The agent confirmed, "Okay, do you understand that?"  And Defendant replied, "Yeah."  (Tr. at 26).  The agent also clarified for Defendant that anything he said could be used as evidence against him, and Defendant acknowledged understanding. (Tr. at 26-27).  Defendant also stated that he understood the right to have a lawyer before he answered any questions or with him during questioning and that a lawyer could be appointed to represent him.  (Tr. at 27).

7

coerced into making the self-incriminating statements involuntarily.  As a result, it is the court's duty "'to examine the entire record and make an independent determination of the ultimate issue of voluntariness.'"  Id. (quoting Davis v. North Carolina, 86 S. Ct. 1761, 1764 (1966)).

In determining whether a statement was made voluntarily, courts are to evaluate "the totality of all the surrounding circumstances--both the characteristics of the accused and the details of the interrogation."  Schneckloth v. Bustamonte, 93 S. Ct. 2041, 2047 (1973).  Those cases where courts have found confessions to be involuntary "all have contained a substantial element of coercive police conduct."  Colorado v. Connelly, 107 S. Ct. 515, 520 (1986).  "[F]actors taken into account have included the youth of the accused, . . . his lack of education, . . . or his low intelligence, . . . the lack of any advice to the accused of his constitutional rights, . . . the length of detention, . . . the repeated and prolonged nature of the questioning, . . . and the use of physical punishment such as the deprivation of food or sleep. . . ."  Schneckloth, 93 S. Ct. at 2047 (citations omitted); see also Hubbard v. Haley, 317 F.3d 1245, 1253 (11th Cir. 2003) ("Among the factors we must consider are the defendant's intelligence, the length of his detention, the nature of the interrogation, the use of any physical force against him, or the use of any promises or inducements by police").  "However, 'while

8

[courts] have enumerated a number of (non-exclusive) factors that may bear on the issue of voluntariness, the absence of official coercion is a *sine qua non* of effective consent. . . .'" Hubbard, 317 F.3d at 1253 (citation omitted).  The determinative question asked is whether there has been police overreaching. See United States v. Bernal-Benitez, 594 F.3d 1303, 1319 (11th Cir. 2010).  "Sufficiently coercive conduct normally involves subjecting the accused to an exhaustingly long interrogation, the application of physical force or the threat to do so, or the making of a promise that induces a confession.'" United States v. Thompson, 422 F.3d 1285, 1295-96 (11th Cir. 2005) (citation omitted).

In this case, Defendant points to the single fact that the agents did not advise him of his Miranda rights (although not required to give Defendant the warnings under the circumstances of this case) and did not conduct the interview in his native language, Spanish, even though resources to do so were readily available. [Doc. 79 at 2-4].  The totality of the circumstances simply do not support a finding that Defendant's statement was involuntary or that the agents' conduct was coercive.

9

Defendant, who possesses some college education in engineering, has been in the United States since 1990, arriving when he was twenty, and is a naturalized United States citizen.[6]  (Tr. at 9).  Defendant had been employed by Delta Airlines as a ramp agent since 1999, and his employment required that he be able to effectively communicate in English, a requirement for job safety.  (Tr. at 8-9; Gov't Ex. 6).  The agents were aware of this information when they conducted the interview with Defendant on May 16, 2013.  (Tr. at 8-10, 32-33).  And the interview with Defendant, at the beginning of which he acknowledged speaking English and advised that he understood 80% of what was being said to him, confirmed that Defendant could communicate adequately in English.  (Tr. at 19-23, 35-36; Gov't Ex. 4 at p. 2).  When Defendant did not understand the agents' statements, including a Miranda right, or questions, Defendant asked for clarification and the agents provided that clarification. And Defendant's subsequent responses indicated his understanding.  (Tr. at 16, 19-23; Gov't Ex. 4).  A review of the interview convinces the court that Defendant understood the information relayed by the agents, understood that they believed he had engaged in

_____

[6]The court notes that in order to pass the citizenship test, given the circumstances presented by Defendant, he was required to read, write and speak English.  See http:\\www.immigrationdirect.com (follow hyperlink "US Citizenship") (last visited January 3, 2014).

10

criminal activity, and understood that they were seeking his cooperation but that he was free to not answer questions and to leave the interview.

The singular fact that Spanish, not English, was Defendant's native language and that he did not understand 100% of the conversation simply does not render his statement involuntary. In <u>United States v. Manta-Carillo</u>, 2011 WL 3235757 (S.D. Ala. July 28, 2011), the district court rejected the defendant's contention that his lack of understanding of the English language rendered his non-custodial statement involuntary. <u>Id.</u>, at *4. The court held that "[a] language barrier alone does not render a confession involuntary." <u>Id.</u> (citing <u>Bernal-Benitez</u>, 594 F.3d at 1319-20). In <u>Bernal-Benitez</u>, the Eleventh Circuit Court of Appeals rejected a defendant's claim that, because he spoke only Spanish, his confession written in English, which he signed, was involuntary. The court, although noting the procedure was unusual, found no evidence of police overreaching and upheld denial of the motion to suppress the statement. 594 F.3d at 1319-20. <u>And see</u> <u>United States v. Pule</u>, 2012 WL 6760630, at *10 (E.D. Tenn. July 5, 2012) (finding that, although the defendant "is familiar with English only as a second language, the evidence demonstrates he is able to understand and converse in English" and rejecting the defendant's claim his confession was involuntary).

11

Similarly, while "language barriers may in some instances impair an individual's ability to waive his [Miranda] rights in a knowing manner," United States v. Boon San Chong, 829 F.2d 1572, 1579 (11th Cir. 1987), the evidence before the court outlined herein would not support such a finding even if this had been a custodial interview requiring warnings and a valid waiver. See United States v. Al-Cholan, 610 F.3d 945, 954 (6th Cir. 2010) (while language difficulties could impair finding a valid waiver of Miranda rights, the evidence did not support a conclusion that the defendant, who had resided in the United States for twelve years, who, as part of the naturalization process, passed an English proficiency test, and who had advised the interviewing agent that he spoke English, did not understand his rights when advised in English); United States v. Shaukat, 2005 WL 2886036, at **2-3 (S.D. Ga. October 28, 2005) (the court found that the defendant, who was advised of his rights in English and advised the agent that he spoke, read and wrote in English, who had lived in the United States for six years, working in convenience store, and who did not have difficulty conversing with the agent, executed a valid waiver of his rights); cf. United States v. Srisanthia, 2013 WL 3070857, at **15-16 (M.D. Fla. June 17, 2013) (finding that defendant's waiver of rights was not valid, when he was advised of his rights in English but stated that "he might only understand 'like half or something like that' as to what [the officer] might

say[,]" and stated that he spoke Thai and "'I talk English a little bit too[,]'" because the transcript of the interview established that the defendant simply did not understand his rights or the officer's attempt to explain "in simpler terms" those rights, and because the evidence presented by the defendant demonstrated the defendant's undisputed lack of understanding of the English language).[7]

---

[7]Similarly, when determining whether a defendant's limited understanding of English impairs the voluntariness of consent to search, "courts examine [the defendant's] ability to interact intelligently with the police." United States v. Zapata, 180 F.3d 1237, 1242 (11th Cir. 1999). If that test was utilized to determine the voluntariness of Defendant's statement, the evidence demonstrates that Defendant's ability to interact with the agents was not impaired due to any lack of understanding and that he was able to intelligently communicate with the agents. See United States v. Guzman, 454 Fed. Appx. 531, 534 (8th Cir. 2012) (although there was a "'language barrier'" and "'apparent lapses in communication'" between the defendant and the officer, the court noted that the defendant "responded appropriately to most of the questions and requests made by [the officer and that the defendant] did not object to the search once it had begun," the court upheld the consent); United States v. Gamez-Acuna, 375 Fed. Appx. 809, 814-15 (10th Cir. 2010) (because the defendant was able to provide information to the Trooper about various topics and to follow the Trooper's directions and was able to understand and respond appropriately to most of the questions, the court found that the defendant "understood sufficient English to freely and unequivocally consent"); United States v. Valdez, 147 Fed. Appx. 591, 596 (6th Cir. 2005) (finding that the defendant's "tenuous grip on the English language [did not] render[ ] his consent involuntary[,]" the court noted that the defendant responded appropriately to inquiries and requests to produce documents).

13

And no other circumstances support a finding that the interview was coercive. As the Supreme Court has recognized, "Any interview of one suspected of a crime by a police officer will have coercive aspects to it, simply by virtue of the fact that the police officer is part of a law enforcement system which may ultimately cause the suspect to be charged with a crime." Oregon v. Mathiason, 97 S. Ct. 711, 714 (1977). However, courts have recognized that non-custodial interviews are not nearly as "inherently coercive" as those that take place while a suspect is in custody. New York v. Quarles, 104 S. Ct. 2626, 2630 (1984); accord United States v. White, 846 F.2d 678, 689 (11th Cir. 1988) ("The same concerns do not exist when interrogation does not occur in custody."). In the present case, the circumstances of the non-custodial interview of Defendant were not remotely sufficiently coercive to render his self-incriminating statements involuntary. Unlike other cases where police conduct was found oppressive, here the agents did not restrain Defendant and did not use or threaten to use physical punishment. (Tr. at 12, 14-15, 17, 23). Defendant was advised that he was free to leave and was not under arrest. (Tr. at 14). The agents did not make Defendant any promises. (Tr. at 14, 17, 23). Defendant was advised of his rights. (Tr. at 21-23; Gov't Ex. 5). Nothing about the interview evidenced police overreaching. See Connelly, 107 S. Ct. at 520 n.1 (citing Mincey v. Arizona, 98 S. Ct. 2408 (1978)

14

(defendant subjected to four hour interrogation while incapacitated and sedated in intensive-care unit); Greenwald v. Wisconsin, 88 S. Ct. 1152 (1968) (defendant, on medication, interrogated for over eighteen hours without food or sleep); Beecher v. Alabama, 88 S. Ct. 189 (1967) (police officers held gun to the head of wounded confessant to extract confession)).  In addition, there is evidence that Defendant, an adult, is educated and has lived and worked, as a naturalized citizen, in the United States for a long time.  (Tr. at 8, 16).  And there is no evidence that Defendant possesses a low intelligence.  See Schneckloth, 93 S. Ct. at 2047.

### III.   Conclusion

The totality of the circumstances demonstrates that Defendant's statement to the agents was voluntary.  For these reasons, the court **RECOMMENDS** that Defendant's motion [Doc. 61] to suppress statements be **DENIED**.

### MOTION FOR SEVERANCE

Defendant also seeks a severance, pursuant to Fed. R. Crim. P. 14, from his co-Defendants for trial.  [Doc. 62].  Defendant Gonzalez-Tercerro contends that he will suffer compelling prejudice from the "spillover effect" of evidence presented exclusively against his co-Defendants.  [Id. at 2].  Defendant claims that, besides his confession, the only evidence introduced against him at trial will be the testimony of

15

cooperating Defendants and that unspecified "substantial evidence exists against co-defendant Jose Antonio Martinez, specifically." [Id. at 3]. And, without providing any justification or reasoning supporting this conclusory assertion, Defendant states that "[t]he majority of the evidence that would be presented against [his co-Defendants] would be irrelevant and inadmissible against Defendant." [Id.]. In response, the Government points out that all of the Defendants are named in a conspiracy under 21 U.S.C. § 846.[8] [Doc. 82 at 1-2]. According to the Government, the evidence presented at trial will demonstrate that all of the named Defendants, including Defendant Gonzalez-Tercerro, participated in the conspiracy by off-loading the luggage containing controlled substances during the time period set forth in the indictment. [Id. at 2-4]. The evidence of seizures of luggage containing controlled substances, even if not directly implicating Defendant, all occurred while he engaged in the charged conspiracy. [Id.]. For this reason, the Government contends that Defendant cannot establish compelling prejudice or that cautionary jury instructions are not adequate to address any prejudice in this case. [Id. at 5]. The court agrees and finds that Defendant has not established grounds for a severance.

---

[8]The Government also notes that Defendant Martinez is entering a plea and not participating in the trial against Defendant Gonzalez-Tercerro. [Doc. 82 at 4].

16

## I.      The Indictment

The first superseding indictment alleges that, from on or about May 2009 and continuing until on or about January 13, 2012, Defendant Gonzalez-Tercerro, along with co-Defendants Martinez, Eduardo Fernandez, and Jose Coto-Lopez, conspired to violate 21 U.S.C. § 841, that is, to possess with the intent to distribute a controlled substance, cocaine, all in violation of 21 U.S.C. § 846.  [Doc. 20, Count One].  In Count Two, on or about May 8, 2009, Defendant Martinez is charged with knowingly attempting to import a quantity of cocaine, in violation of 21 U.S.C. §§ 952(a) and 960(a)(1), (b)(1)(B)(ii).  [Id., Count Two].

## II.      Discussion

Defendant seeks a severance based on Fed. R. Crim. P. 14.  "Rule 14(a) states, 'If the joinder of . . . defendants in an indictment . . . appears to prejudice a defendant or the government, the court may . . . sever the defendants' trials, or provide any other relief that justice requires.'"  United States v. Blankenship, 382 F.3d 1110, 1120 (11th Cir. 2004).  The Eleventh Circuit Court of Appeals further has stated, "We have long recognized that 'a District Court confronted with a Rule 14 Motion for Severance is required to balance any . . . prejudice [to the defendants] against the interests of judicial economy, a consideration involving substantial discretion.'"  Id. (citation omitted).  "In

17

practice, the general rule is that defendants who are jointly indicted should be tried together, particularly in conspiracy cases." United States v. Baker, 432 F.3d 1189, 1236 (11th Cir. 2005); see also United States v. Browne, 505 F.3d 1229, 1268 (11th Cir. 2007) (same).  To justify severance, a defendant must show compelling prejudice to the conduct of his defense resulting in fundamental unfairness.  See Baker, 432 F.3d at 1236; United States v. Schlei, 122 F.3d 944, 984 (11th Cir. 1997).  "'This is a heavy burden, and one which mere conclusory allegations cannot carry.'"  United States v. Walser, 3 F.3d 380, 386 (11th Cir. 1993) (quoting United States v. Hogan, 986 F.2d 1364, 1375 (11th Cir. 1993)); see also Browne, 505 F.3d at 1268.

As noted, Defendant Gonzalez-Tercerro is charged with a conspiracy to possess with the intent to distribute a controlled substance, cocaine.  [Doc. 20].  It is the general rule in conspiracy cases that "defendants indicted together should be tried together." United States v. Cassano, 132 F.3d 646, 651 (11th Cir. 1998); see also Browne, 505 F.3d at 1268 (noting that it "is particularly true in conspiracy cases" that persons indicted together be tried together); United States v. Gossett, 877 F.2d 901, 904 (11th Cir. 1989) ("Generally, coconspirators should be tried jointly.").  Although this is not quite an ironclad rule, the "exceptional circumstances justifying a deviation from the rule . . . are few and far between."  United States v. Lopez, 649 F.3d 1222, 1234 (11th

18

Cir. 2011).  In order to overcome this presumption and to establish that severance of Defendants is mandated pursuant to Rule 14, Defendant Gonzalez-Tercerro must not only show specific prejudice but also that "'there is a serious risk that a joint trial would compromise a specific trial right . . ., or prevent the jury from making a reliable judgment about guilt or innocence.'" <u>Blankenship</u>, 382 F.3d at 1123 (citation omitted). Additionally, Defendant must demonstrate "that a severance is the only proper remedy for that prejudice - jury instructions or some other remedy short of severance will not work." <u>Lopez</u>, 649 F.3d at 1234 ("Because limiting instructions usually will cure any prejudice resulting from a joint trial, . . . the Supreme Court has indicated that severances need be granted only if there is a serious risk that a joint trial would either 'compromise a specific trial right of one of the defendants' or 'prevent the jury from making a reliable judgment about guilt or innocence' even if limiting instructions are given.") (citation omitted).

Defendant has not presented any arguments that support a finding that a specific trial right will be compromised by a joint trial. [Doc. 62].  Instead, Defendant relies on fairly vague claims that a joint trial will result in the introduction of evidence on the charged conspiracy that would otherwise not be admissible against him at a separate trial.  [<u>Id.</u> at 3].  Defendant does not identify this evidence nor present reasons in

support of his claim that this evidence would not otherwise be admissible against him. [Doc. 62].

Defendant's "spillover" argument falls within the second category mandating a severance, that is, preventing the jury from making a reliable judgment. This category applies generally to three situations. "First, severance is mandated where compelling evidence that is not admissible against one or more of the co-defendants is to be introduced against another co-defendant." Blankenship, 382 F.3d at 1123. However, this situation does not involve the mere disparity in the quality or amount of evidence introduced against one or more defendants and only applies where there is a minimal chance that limiting instructions will provide adequate relief. See Baker, 432 F.3d at 1236 (holding that "a defendant does not suffer 'compelling prejudice simply because much of the evidence at trial is applicable only to his codefendants,' . . . even when the disparity is 'enormous'") (quoting Schlei, 122 F.3d at 984).

Defendant's conclusory assertions in support of severance on this ground are not sufficient. The Government alleges that Defendant was a participant in the conspiracy during the entire time period charged in the indictment. [Doc. 82 at 2]. As such, all of the conduct of his co-conspirators in furtherance of the charged conspiracy is admissible against him whether or not he directly participated in each event. See

20

United States v. Peeples, 23 F.3d 370, 373 (11th Cir. 1994) ("a conspirator is responsible for the conspiracy's activities in which he is involved, and for drugs involved in those activities, and for subsequent acts and conduct of coconspirators, and drugs involved in those acts or conduct carried on in furtherance of the conspiracy which is reasonably foreseeable to him").  And, even if some evidence is only admissible against a co-conspirator, Defendant failed to present any reasons why cautionary instructions will not suffice.

Severance is also mandated upon a showing of prejudice "in an extremely narrow range of cases in which the sheer number of defendants and charges with different standards of proof and culpability, along with the massive volume of evidence, makes it nearly impossible for a jury to juggle everything properly and assess the guilt or innocence of each defendant independently."   Blankenship, 382 F.3d at 1124. Defendant does not argue that a severance should be granted on this basis.  [Doc. 62]. And, "[f]inally, severance is required . . . where one defendant is being charged with a crime that, while somehow related to the other defendants or their overall criminal scheme, is significantly different from those of the other defendants."  Id. at 1125. Defendant also does not argue that this is a factor to consider in granting him a severance.  [Doc. 62].

21

Finally, as stated by the Supreme Court in <u>Zafiro v. United States</u>, 113 S. Ct. 933 (1993), "Rule 14 leaves the determination of risk of prejudice and any remedy that may be necessary to the sound discretion of the district courts." <u>Id.</u> at 939.  If compelling prejudice is established at any point in time, this discretion may be exercised by the trial court before or even during trial.  <u>See</u> <u>United States v. Pedrick</u>, 181 F.3d 1264, 1272 (11th Cir. 1999) (based on its continuing duty to grant a severance when compelling prejudice is demonstrated, trial court granted a severance of a defendant during the course of trial); <u>United States v. Kopituk</u>, 690 F.2d 1289, 1316 (11th Cir. 1982) ("[T]he court fulfilled its 'continuing duty at all stages of the trial to grant a severance if prejudice does appear.'") (quoting <u>Schaffer v. United States</u>, 80 S. Ct. 945, 948 (1960)). The Supreme Court in <u>Zafiro</u> specifically noted that even if prejudice is shown or the risk of prejudice is high, severance is not required and that "less drastic measures, such as limiting instructions, often will suffice to cure any risk of prejudice."  113 S. Ct. at 938.  All of these decisions are left to the sound discretion of the trial court to address if any situation involving prejudice may arise during trial.  However, at this stage in the

22

proceedings, the court finds that Defendant has not established a basis for granting a Rule 14 severance.[9]

### III.   Conclusion

For these reasons, the court **RECOMMENDS** that Defendant's motion [Doc. 62] for severance be **DENIED**.

### Conclusion

For the foregoing reasons and cited authority, the court **RECOMMENDS** that Defendant's motion [Doc. 61] to suppress non-custodial statements be **DENIED** and that Defendant's motion [Doc. 62] for severance pursuant to Rule 14 be **DENIED**.

There are no other pending matters before the Magistrate Judge, and the undersigned is aware of no problems relating to the scheduling of this case.

---

[9]Because the court determined that Defendant has not demonstrated compelling prejudice requiring a severance, the court does not address Defendant's argument that judicial economy is not a factor in this case weighing against granting his motion. [Doc. 62 at 3-4]. However, given the nature of the charges in this case, the court agrees with the Government's summary of the adverse impact of separate trials on judicial economy which would weigh against granting a severance. [Doc. 82 at 7].

23

**IT IS THEREFORE ORDERED** and **ADJUDGED** that this action be and the same is hereby, declared Ready for Trial as to all Defendants.

**IT IS SO ORDERED and DIRECTED**, this 10th day of January, 2014.

JANET F. KING
UNITED STATES MAGISTRATE JUDGE

24